**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **HENRY COUNTY SCHOOL DISTRICT,** ) | |
| ) | **Civil Action No.** |
| **Plaintiff,** ) | _____ |
| ) | |
| **v.** ) | |
| ) | |
| **C.H., by and through J.H., and J.H.,** ) | |
| ) | |
| **Defendants.** ) | |

## <u>COMPLAINT</u>

Plaintiff, the Henry County School District (hereinafter "Plaintiff" or "School District") hereby brings this civil action against C.H., by and through J.H. and J.H. The School District seeks review of a decision rendered by an administrative law judge pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400, et seq., O.C.G.A. § 20-2-152, and Georgia Board of Education Rules ("Georgia Rules") § 160-4-7-12(3)(u). Plaintiff seeks *de novo* review and declaratory relief reversing the administrative law judge's decision that the School District failed to provide C.H. with a free and appropriate education, that it denied C.H.'s right to an Independent Educational Evaluation under the IDEA, that it denied C.H. an education in his Least Restrictive Environment. Plaintiff also seeks reversal of the ALJ's decision that Defendants are entitled to reimbursement for private

placement or compensatory education services as this ruling is not supported by the evidence or the applicable law.

## I. <u>JURISDICTION AND VENUE</u>

### 1.

This action arises under 20 U.S.C. §§ 1415(i)(2)(A) and 1415(i)(3)(A) and seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

### 2.

Because the Defendants reside within the Northern District of Georgia, Atlanta Division, venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b).

## II. <u>PARTIES</u>

### 3.

Plaintiff is the Henry County School District, a public corporate body and a political subdivision operating in Henry County, Georgia, under the Constitution and laws of the State of Georgia, with the capacity to sue and be sued.

### 4.

Defendants are C.H. by and through his parent, J.H., and J.H. Defendants are residents of Henry County, Georgia.

### III. <u>FACTUAL ALLEGATIONS</u>

5.

At the time of the hearing request, Plaintiff ("C.H.") was an eight-year-old child.

6.

C.H. is a resident of the School District and eligible under the IDEA as a student with a disability. As a result, he has an Individualized Education Plan ("IEP") that describes his present levels of performance, goals and objectives, educational services, supports, and accommodations that he receives.

7.

C.H. is currently homeschooled but last attended Hickory Flat Elementary ("Hickory Flat") in the District during the 2022-2023 school year when he was in kindergarten.

8.

C.H.'s adaptive, communication, motor, personal-social, and cognitive delays negatively impact his access to education. Therefore, he receives special education supports to be successful in the general education setting.

9.

On April 21, 2022, C.H. was found eligible for special education services under the eligibility categories of Autism ("AUT") and Speech/Language Impairment ("SLI").

10.

C.H. enrolled in Kindergarten at Unity Grove Elementary School ("Unity Grove") for the 2022-2023 school year in the AUT general education program ("AUT-GEN").

11.

While at Unity Grove, Ms. Tanya Lunsford taught C.H. in the AUT-GEN classroom.

12.

During the semester C.H. was in her classroom, there were three adults in the classroom: Ms. Lunsford and two paraprofessionals. A third paraprofessional was added later in the semester due to the classroom's needs.

13.

Ms. Lunsford's classroom contained a sensory area, calming area, token board, toilet button for non-verbal students, core word board, visual schedule, and other visuals throughout the classroom. Additionally, a bathroom was attached to the classroom and contained visual instructions. Furthermore, to assist the students

in their social skills, Ms. Lunsford utilized Teachtown, a research-based curriculum, to provide social skills to the children by showing puppets to act out skits.

14.

Pursuant to C.H.'s 2022 IEP, C.H. received occupational therapy ("OT") for thirty minutes once per week, and speech therapy ("ST") in thirty-minute increments twice per week.

15.

While in the AUT-GEN classroom, C.H. received supportive, direct instruction in the general education setting for science, social studies, recess, and lunch, and small group instruction in all other areas.

16.

C.H. began the school year working toward five measurable annual goals, each with its own short-term objectives. C.H. had goals targeting his communication and speech language, daily living skills, emotional/social/behavioral, academic, and fine/gross motor skills.

17.

Per C.H.'s IEP goals, for speech, C.H. was working toward making independent requests, identifying high-frequency words, and answering simple yes/no questions. In daily living, C.H. was working toward a toileting routine. For emotional/social/behavioral, C.H. was working toward playing with a peer without

disturbing the child's play and turn-taking. For academic objectives, C.H. was working toward identifying ten core words as well as his name and identifying the numbers 3, 6, and 9. For fine/gross motor, C.H. was working from tracing to copying, prewriting strokes and shapes, as well as writing his first and last name from minimal assistance to supervision.

18.

Ms. Lunsford worked toward C.H.'s goals with his toileting routine while C.H. was in her classroom.

19.

While C.H. was in Ms. Lundsford's class, he had difficulties following directions without a lot of support, including visuals and verbal cues. Additionally, he could only stay on task for approximately five minutes.

20.

 At the time of the September 15, 2022, IEP team meeting, C.H. had been attending the kindergarten AUT-GEN classroom for approximately six weeks

21.

C.H.'s IEP team held an annual review meeting on September 15, 2022, to discuss C.H.'s academic and behavior present levels, goals, and services.

22.

C.H. had needs in verbal communication, including using a communication device that he had received while in pre-school. C.H.'s device was a GoTalk device.

23.

Ms. Lunsford shared in the IEP meeting that in her class, C.H. seemed to have no interest in using the device and would often fuss and not comply with using it.

24.

Ms. Lunsford shared that C.H. was very distracted in the autism classroom, and that while he did not write his name in the classroom, when he was in a therapy session one-on-one with limited distractions, he was working on that task.

25.

In general, C.H. worked better in small groups and did not do well in the transition to the general education setting.

26.

C.H. was not making progress toward approaching the grade-level standards and Ms. Lunsford reviewed C.H.'s lengthy needs and struggles during the meeting.

27.

During the September 15, 2022, IEP meeting, J.H. raised a concern about C.H.'s behavior and indicated she did not see that type of behavior at home.

However, J.H. would come by the classroom,[1] see C.H. crying on the floor, and then C.H. would go to his desk once he saw her.

28.

Additionally, during the September 15, 2022, meeting, J.H. requested a vest to assist C.H.'s sensory needs, and the team agreed to try one out. The vest was subsequently used when necessary.

29.

J.H. further requested at the September 15, 2022, meeting that C.H.'s private applied behavior analysis ("ABA") therapist be allowed to come to the school to work with C.H. in the classroom.

30.

ABA therapy is a therapy based on the science of learning and behavior, often used with individuals who have intellectual and developmental disabilities like autism spectrum disorder.

31.

The team informed J.H. that the District likely would not allow C.H.'s private ABA therapist in the classroom due to the privacy of other students.

---

[1] J.H. was a permanent substitute teacher at Unity Grove Elementary School during this time.

32.

However, the District employs and contracts Board Certified Behavior Analysts ("BCBAs") and Registered Behavior Technicians ("RBTs") who work with students with behavioral needs.

33.

The team determined that C.H. would continue to receive supportive, direct instruction in the general education setting for science, social studies, and recess, while also receiving small group instruction in English language arts, math, social skills, and lunch outside of the general education classroom

34.

Additionally, the team determined C.H. would receive instructional accommodations that included extended time, frequent monitored breaks, preferential seating, repetition of directions, small group setting, oral reading of test questions, and if-then statements. C.H. continued to have access to an assistive technology ("AT") communication device.

35.

The team determined C.H. would continue to receive ST and OT at the same frequency per week.

36.

The team added special transportation.

37.

Following the September 15, 2022, annual review meeting, Ms. Lunsford became concerned that C.H.'s needs might require a change in service delivery model and program, and informed J.H. of the same, which led to a November 28, 2022, IEP team meeting.

38.

During the November 28, 2022, meeting, the team discussed whether C.H. would best be served in the AUT adaptive curriculum program ("AUT-AC") due to his lack of progress in the AUT-GEN program.

39.

After reviewing data and observations, the IEP team decided that the appropriate service delivery model for C.H. was the AUT-AC program specifically because C.H. had not shown growth toward meeting his IEP goals and would become overwhelmed and frustrated easily in the AUT-GEN classroom.

40.

J.H. indicated that C.H. had become more frustrated at home since being in the AUT-GEN classroom and that the adaptive classroom may be beneficial.

41.

Ms. Lunsford believed that, based on C.H.'s cognitive and adaptive needs, C.H. would not be able to meet or approach expectations in the general education classroom.

42.

At the November 28, 2022, meeting, J.H. did not disagree with the team's decision.

43.

At this time, an AUT-AC program was unavailable for C.H. to attend at Unity Grove; therefore, C.H.'s service school was changed to Hickory Flat, as it was the closest available program.

44.

The team determined this change would take effect on December 5, 2022.

45.

On December 2, 2022, the IEP team convened to discuss parental concerns over the change in schools. Specifically, J.H. raised concerns regarding special transportation and the amount of time C.H. would be on the bus, as well as general questions about the program teacher and the classroom.

46.

Representatives from the program at Hickory Flat attended the meeting and answered J.H.'s questions about the program. The team reconfirmed with J.H. that the school could not confirm information about the bus route or time.

47.

During the December 2, 2022, IEP team meeting, J.H. informed the team that C.H. would be attending an intensive therapy program at the Marcus Institute beginning December 12, 2022, that would run to the end of the semester.

48.

As a result of the anticipated therapy program, the team delayed the start of the change in program to the beginning of the next school semester on January 9, 2023.

49.

C.H. attended intensive trip training therapy through the Marcus Institute between January 3, 2023, and January 17, 2023. Trip training therapy is used for toilet-training.

50.

C.H. attended trip training therapy because he was not toilet-trained when he began kindergarten.

51.

J.H. was not attempting to toilet-train C.H. at home prior to enrolling him in the program.

52.

C.H. began at Hickory Flat on January 18, 2023, with Ms. Naomi Martuzas as his special education teacher.

53.

Ms. Martuzas is a certified teacher who has taken tests in the area of Special Education Math Cognitive Level and Special Education Science Cognitive Level. She also has certifications in Special Education Adapted Curriculum Consultative, Special Education Deaf ED Consultative, and Special Education General Curriculum Consultative.

54.

The classroom C.H. was in had one teacher and one paraprofessional, with a second paraprofessional floating between the two AUT-AC classrooms. As the program is specifically designed for students with autism, the curriculum incorporates an ABA component to provide academic support. The program likewise provides support for sensory needs, communication, motor skills, behavior, and adaptive skills.

55.

Ms. Martuzas testified that while in her classroom, C.H. had difficulty staying on task and required a significant amount of time to move around.

56.

Because C.H. was non-verbal, Ms. Martuzas would use some sign language to communicate with C.H. Although C.H. had a communications device, C.H. did not use it in the classroom.

57.

Class dismissal in the AUT-AC class would begin around 1:45 p.m., earlier than the general dismissal time, due to safety concerns.

58.

C.H. was in Ms. Martuzas's classroom for about a month before J.H. withdrew him in February 2023.

59.

Per C.H.'s IEP, he received special transportation to and from school as a related service, which was from his home in Locus Grove to Hickory Flat. C.H. lived approximately one mile from Unity Grove, and approximately fourteen miles from Hickory Flat.

60.

When C.H.'s placement changed in December, no drivers were traveling in the necessary direction either before school or after school.

61.

For the morning route, the District's proposed plan would have a bus pick up C.H. first, since he was the farthest away, around 5:45 a.m., with an approximate arrival time of 7:00 a.m. Then, in the afternoon, another bus would pick up C.H. at dismissal from Hickory Flat, located in the northern part of McDonough, and drive to EXCEL Academy in central McDonough, where C.H. would transfer to the bus that would continue on to Locust Grove.

62.

In the afternoon, the District's proposed plan would have C.H. arrive home around 4:15 p.m., depending on the stops and traffic.

63.

Although the District had the vehicles to add a route, it did not have the personnel to drive another bus due to staff shortages at the time. The timing of the pickups and drop-offs was variable due to the extensive traffic between Locust Grove and McDonough, which mainly consists of two-lane roads.

64.

C.H. never rode the bus in the few weeks he attended Hickory Flat.

65.

On February 22, 2023, the District's transportation department emailed J.H. additional options for transportation. These options included having the bus and J.H. meet at a mutual location to reduce the ride, a direct route with childcare before school opens, and the afternoon route starting earlier, or a route with a bus change.

66.

On February 9, 2023, the IEP team convened to discuss parental concerns. The meeting included attorneys, as well as representatives from the transportation department.

67.

J.H. raised concerns about the placement, transportation, behaviors of other students in the classroom, the furniture in the classroom, progress toward goals, early dismissals, and OT. Additionally, J.H. raised concerns that the IEP was not being implemented and that C.H. stayed in the classroom all day, including for lunch.

68.

After attending school at Hickory Flat for three and a half weeks, on February 10, 2023, C.H. was withdrawn from Hickory Flat.

69.

J.H. began homeschooling C.H. the following school day, February 13, 2023.

70.

At the February 9, 2023, meeting, J.H. requested independent educational evaluations ("IEEs") of C.H., including psychological, OT, AT, and ST evaluations.

71.

On February 10, 2023, the District provided information regarding the guidelines, a list of possible evaluators, and the maximum costs the District would reimburse.

72.

For AT the maximum cost was $500.00. For a functional behavior assessment ("FBA") the maximum cost was $150.00 per hour for a BCBA-D and $100.00 per hour for a BCBA. For an OT IEE the maximum cost was $1,300.00. For a psychological the maximum was $3,000.00. For a speech IEE, the maximum fee was $1,500.00.

73.

The District based these costs on an investigation into rates within the region, which showed a speech IEE would cost between $1,500.00 and $2500.00.

74.

C.H. was last evaluated while in pre-school in April 2022.

75.

The District completed a psychoeducational evaluation in February 2022, which it used during the eligibility meeting on April 11, 2022, a Speech-Language Summary Report in April 2022, and an OT Annual Review in September 2022.

76.

Mindy Cohen conducted a comprehensive speech-language IEE on April 5, 2023, and April 12, 2023.

77.

Ms. Cohen's rate for an IEE was $2000.00, and the District covered $1500.00 pursuant to its published guidelines.

78.

On September 12, 2024, and June 17, 2024, over a year after C.H. had withdrawn from the District, Dr. Kim Ono completed a neuropsychological evaluation IEE.

79.

At the February 2023 meeting, J.H. requested an OT IEE. J.H. requested Ms. Cottos provide the IEE and the District began working with Ms. Cottos to contract with her as an independent evaluator.

80.

Ms. Cottos' rate for an OT evaluation was $2000.00, well-above the District's published criteria. Ms. Cottos did not conduct an OT evaluation prior to the due process hearing.

81.

C.H. currently receives private speech, ABA, and OT therapy.

82.

C.H. is receiving 27.5 hours per week of ABA therapy, of which two hours have BCBA supervision by video.

83.

On or about February 6, 2024, J.H. on behalf of C.H. requested an administrative hearing pursuant to the IDEA.

84.

A hearing was held in this matter over the course of four days between November 4 and November 7, 2024, before administrative law Judge Ana Kennedy ("ALJ") of the Georgia Office of State Administrative Hearings, Case No. OSAH-DOE-SE-2428737-75-Kennedy.

85.

Following the hearing, the record remained open for Defendants to review documents provided by the Plaintiffs during the hearing in partial response to a subpoena Defendants served upon the District on October 8, 2024.

86.

At the start of the hearing, Plaintiff explained that it did not have all responsive documents regarding the October 8, 2024, subpoena. Plaintiff provided some documents on the second day of the hearing.

87.

Following the hearing, the ALJ issued an Order requiring the District to respond to Defendants' subpoena by November 20, 2024.

88.

On December 16, 2024, Defendants filed a Motion for Default.

89.

On January 15, 2025, the District filed its Response to the Motion and the Defendants replied on January 20, 2025.

90.

On March 3, 2025, the ALJ issued an Order Regarding Defendants' Motion for Entry of Default Order, in which the ALJ found the Plaintiffs' failure to comply

with the subpoena or seeking to quash warranted a default as to the issues raised regarding Speech and Occupational Therapy.

91.

The ALJ required the parties to submit their proposed findings and conclusions of law by February 21, 2025. However, on February 4, 2024, Defendants requested an extension, to which Plaintiff did not object. Therefore, on February 6, 2025, the ALJ issued an order extending the deadline to submit the proposed findings of fact and conclusions of law to March 7, 2025.

92.

On February 20, 2025, Defendants submitted a Motion to Introduce into the Record Documents and Educational Records, to which Plaintiff filed a Response on March 3, 2025.

93.

On March 6, 2025, the ALJ issued an Order Granting, in part, and Denying, in part, the Motion.

94.

A decision was issued by the ALJ in this matter on April 24, 2025. A true and correct copy of that decision is attached hereto as Exhibit A.

95.

On May 5, 2025, Defendants filed a Motion for Reconsideration and Clarification.

96.

On May 15, 2025, Plaintiff filed its Response to Defendants' motion.

97.

On May 30, 2025, the ALJ granted in part and denied in part Defendants' Motion for Reconsideration and Clarification. A true and correct copy of that decision is attached hereto as Exhibit B.

## IV. LEGAL AND FACTUAL ERRORS MADE

98.

The ALJ erred in finding that the School District committed procedural violations that denied C.H. a free and appropriate education ("FAPE"). Specifically, the ALJ erred in finding that the District denied J.H. access to records, or that it prevented parental participation by denying access to records. The ALJ erred in finding that the District untimely produced speech and occupational therapy records.

99.

The ALJ erred in finding that the District's decision regarding special education transportation denied C.H. a FAPE. The ALJ erred in finding that the

District failed to consider all available information when developing a special education transportation plan for C.H.

100.

The ALJ erred in finding that the District failed to provide C.H. his IEP services, and therefore erred in finding that the District did not disclose it was not providing C.H. his IEP services.

101.

The ALJ erred when she found that the District denied C.H.'s right to an IEE under the IDEA in regard to speech and occupational therapy. The ALJ incorrectly concluded that the District set unreasonably low-cost criteria for the provision of independent OT and ST evaluations.

102.

The ALJ erred in determining that the District failed to comprehensively evaluate C.H. when she determined that the District did not appropriately evaluate C.H. for Autism and child apraxia of speech.

103.

The ALJ erred in finding that the District denied C.H. FAPE by failing to provide him an appropriate AT evaluation.

104.

The ALJ erred in finding that the District substantively denied C.H. FAPE by failing to implement a toilet/trip training program, failing to provide him therapies as stated in his IEP, and by providing a bus route that would impede his ability to maintain meaningful progress on his toileting goal/objective.

105.

The ALJ erred in finding that the District's AUT-AC program did not effectively implement C.H.'s IEP.

106.

The ALJ also erred when she found that the District denied C.H. an education in his Least Restrictive Environment ("LRE") by moving his program from the AUT-GEN to AUT-AC.

107.

The ALJ also erred when she improperly awarded relief to J.H., including: reimbursement for costs in the amount of $55,916.67 to J.H, continued private ST, OT, and ABA services at public expense, reimbursement for detailed reasonable transportation costs, reimbursement for J.H.'s monthly services, and compensatory services for ST and OT.

108.

The ALJ's decisions as outlined above are based upon erroneous factual findings and improper legal conclusions that are not supported by the evidence or established law and are entitled to no deference by this Court.

109.

The ALJ erred when she failed to give deference to and discounted the testimony and recommendations of District employees who educated C.H., instead of relying solely upon the testimony of J.H. and independent evaluators who had mere hours of interactions with C.H.

## V. <u>STATUTORY AND REGULATORY FRAMEWORK</u>

110.

The IDEA and Georgia law require school districts to provide FAPE to children with disabilities who because of their impairments need special education and related services. *See*, 20 U.S.C. § 1400(d); 34 C.F.R. § 300.1(a); O.C.G.A. § 20-2-152.

111.

The IDEA requires that FAPE be provided in the LRE. Children with disabilities must be educated with children who are not disabled to the maximum extent appropriate. A child should be removed to a separate school only when the nature or severity of the disability of the child is such that education in a regular

school environment with the use of supplemental aids and services cannot be achieved satisfactorily. 20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. § 300.114(a)(2)(ii).

112.

In conforming with the LRE requirements of IDEA, unless the IEP of a child with a disability requires some other arrangement, the child must be educated in the school that he or she would attend if nondisabled. If the IEP requires some other arrangement, the child must be placed as close to the child's home as possible. 34 C.F.R. § 300.116(c).

113.

The special education services and placement needed by a disabled child to receive FAPE must be based on the child's unique needs and not on the child's disability. 34 C.F.R. § 300.39(a).

114.

The related services required by the IDEA are those "developmental, corrective, and other supportive services are required to assist a child with a disability to benefit from special education…." 34 C.F.R. § 300.34(a). If a service is not required to assist a child with a disability to benefit from special education, a school system is not obligated to provide it at public expense simply to maximize a child's potential. *Id.*

115.

The IDEA does not require school districts to provide every possible service or therapy to a student that might maximize that student's potential. Rather, the requirement to provide a student with FAPE is satisfied if a school district provides appropriate educational services which are individually tailored to a student's needs and which are reasonably calculated to allow the student to make measurable gains in the classroom.

## VI. <u>CLAIMS FOR RELIEF</u>

### Count I – IDEA. 20 U.S.C. § 1400. *et seq.*

116.

The District re-alleges and repeats Paragraphs 1 through 115 as if fully set forth herein.

117.

The ALJ's final decision erroneously determines that the School District did not provide C.H. with a FAPE through the proposed special education transportation as C.H. would have encountered the same difficulties by using private transportation.

118.

The decision of the ALJ is based upon an unsupported Findings of Fact and erroneous Conclusions of Law. Therefore, the decision below is not entitled to any deference by this court.

119.

The decision of the ALJ should be rejected under the IDEA and a decision entered that the program and placement offered by the District was appropriate and that the District has no obligations to reimburse the family for private placement or compensatory education services.

## VII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, the School District respectfully requests that this Honorable Court review the record in this case and issue an order holding that:

a.  The School District offered C.H. a free appropriate public education in the least restrictive environment;

b.  The administrative Findings of Fact and Conclusions of Law of the ALJ filed on April 24, 2025, are erroneous, unsupported by and contrary to applicable law and evidence presented during the hearing;

c.  The decision of the ALJ filed on April 24, 2025, must be reversed;

d.  The administrative Findings of Fact and Conclusions of Law of the ALJ filed on May 30, 2025, are erroneous, unsupported by and contrary to applicable law and evidence presented during the hearing;

e.  The decision of the ALJ filed on May 30, 2025, must be reversed;

f.  The School District has no obligation to provide reimbursement for private placement or compensatory education services;

g.     The Defendants are not "prevailing parties" under IDEA;

h.     Award Plaintiff attorney fees and costs; and

i.     Any other relief as this Court may deem just and proper.

Respectfully submitted this 28th day of August, 2025.

        SMITH, WELCH, WEBB & WHITE, LLC

        */s/ Megan Murren Rittle*
        Megan Murren Rittle
        Georgia Bar No. 384595
        Grant E. McBride
        Georgia Bar No. 109812
        Amber D. Porter
        Georgia Bar No. 381536
        *Attorneys for Plaintiff*
        *Henry County School District*

SMITH, WELCH, WEBB & WHITE
2200 Keys Ferry Court
McDonough, GA 30253
(770) 957-3937 phone
(678) 957-9165 fax
mmrittle@smithwelchlaw.com
gmcbride@smithwelchlaw.com
aporter@smithwelchlaw.com

## <u>CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 5.1</u>

Plaintiff's counsel hereby certifies that this pleading has been prepared with one of the font and point selections approved by the Court in L.R. 5.1.

This 29th day of August, 2025.

SMITH, WELCH, WEBB & WHITE, LLC

*/s/ Megan Murren Rittle*
Megan Murren Rittle
Georgia Bar No. 384595
Grant E. McBride
Georgia Bar No. 109812
Amber D. Porter
Georgia Bar No. 381536
*Attorneys for Plaintiff*
*Henry County School District*

SMITH, WELCH, WEBB & WHITE
2200 Keys Ferry Court
McDonough, GA 30253
(770) 957-3937 phone
(678) 957-9165 fax
mmrittle@smithwelchlaw.com
gmcbride@smithwelchlaw.com
aporter@smithwelchlaw.com

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **HENRY COUNTY SCHOOL DISTRICT,** | ) | |
| | ) | |
| | ) | **Civil Action No.** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **C.H., by and through J.H., and J.H.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day electronically filed PLAINTIFF'S

COMPLAINT with the Clerk of Court using the CM/ECF system to the following

parties:

Chris E. Vance and Justin Crozier
Chris E. Vance, P.C.
2415 Oak Grove Valley Road NE, Suite 100
Atlanta, GA 30345
*Attorneys for Defendants*

This 29th day of August, 2025.

SMITH, WELCH, WEBB & WHITE, LLC

*/s/ Megan Murren Rittle*
Megan Murren Rittle
Georgia Bar No. 384595
Grant E. McBride
Georgia Bar No. 109812
Amber D. Porter

Georgia Bar No. 381536
*Attorneys for Plaintiff*
*Henry County School District*

SMITH, WELCH, WEBB & WHITE
2200 Keys Ferry Court
McDonough, GA 30253
(770) 957-3937 phone
(678) 957-9165 fax
mmrittle@smithwelchlaw.com
gmcbride@smithwelchlaw.com
aporter@smithwelchlaw.com